UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARCO V. BRAVO, WILSON VICUNA,
BLANCA ALVAREZ, DEIFILIO                                    **REPORT AND**
CORDERO, individually and on behalf of                     **RECOMMENDATION**
others similarly situated,                                 15 CV 0030 (DLI) (CLP)

                              Plaintiffs,


                      - against -


GRAND REVIEW, LLC, URBAN AMERICAN
MANAGEMENT CORP., and URBAN
AMERICAN MANAGEMENT, LLC,

                              Defendants.
-------------------------------------------------------------X

        On January 6, 2015, plaintiffs Marco V. Bravo, Wilson Vicuna, Blanca Alvarez, and

Deifilio Cordero, individually and on behalf of others similarly situated, commenced this action

seeking unpaid minimum wages and overtime, pursuant to the Fair Labor Standards Act, 29

U.S.C. § 201 et seq. ("FLSA"), and the New York Labor Law, N.Y. Lab. Law § 190 et seq.

("NYLL"), along with claimed violations of the record-keeping provisions of the FLSA, and

failure to make timely payment of wages under the NYLL.  (Compl.[1] ¶¶ 31, 36, 39, 43, 46).

Currently before the undersigned is defendants' motion to enforce a settlement allegedly reached

between the parties on March 19, 2015.

        For the reasons set forth below, it is respectfully recommended that defendants' motion

be denied.

_____

        [1]Citations to "Compl." refers to plaintiffs' Complaint, filed on January 6, 2015.  In the
Complaint, plaintiffs properly number the allegations through paragraph 23; however, after
paragraph 23, plaintiffs begin numbering the paragraphs at 1 again.  Therefore, the Court will
reference the second paragraphs numbered 1 through 23 as paragraphs 1(a) through 23(a),
respectively.

BACKGROUND

The action was commenced on January 6, 2015 and defendants Grand Review, LLC, Urban American Management Corp., and Urban American Management, LLC were served on January 13, 2015 and January 16, 2015.  According to the Complaint, three plaintiffs were employed as superintendents in several buildings owned and operated by defendants in New York (see Compl. ¶¶ 16, 1(a), 15(a)), and one plaintiff was employed as a porter in several buildings owned and operated by defendants in New York.  (Id. ¶ 8(a)).  Plaintiffs claim that they were not paid for all the hours worked, and that they were not paid minimum wage or overtime for the hours worked over 40 in a week, in violation of the FLSA and NYLL.  (Id. ¶¶ 31, 32, 36, 39, 43).

At the time the Complaint was filed, plaintiffs were represented by Constantine Tryfon Tzifas, Esq., of the firm of Arthur J. Semetis, P.C., located at 286 Madison Avenue, New York, N.Y.  Following the filing of the Answer on February 3, 2015, this Court scheduled an initial conference for March 20, 2015.  On March 19, 2015, defendants requested an adjournment of the conference, indicating that the parties had reached a settlement of the matter.  The Court adjourned the conference without date and ordered the parties to submit a stipulation of discontinuance by April 20, 2015.

On May 21, 2015, the Court was informed that the plaintiffs had reneged on their agreement to settle the action, and on July 28, 2015, defendants moved to enforce the settlement.  In the papers filed in connection with the motion for enforcement of the settlement, Arthur J. Robb, Esq. ("Robb"), counsel for defendants, explains that on February 11, 2015, he reached out to Constantine Tzifas ("Tzifas"), counsel of record for plaintiffs, to explore the possibility of

settlement. (8/24/15 Reply Decl.[2] ¶ 2; Tr.[3] at 3:16-21). Tzifas told Robb to contact Scott London ("London"), whom he identified to Robb as being Counsel to Tzifas' firm, and he also told Robb that London would be handling the litigation. (Id.) When Robb spoke to London that same day, London confirmed to Robb that he was handling the litigation. (8/24/15 Reply Decl. ¶ 3).

According to Robb's Declaration, beginning on February 12, 2015, counsel for the parties engaged in an exchange of emails and calls discussing a potential settlement. (See Robb Decl.[4] ¶ 3, Ex. B). In this initial email exchange between Robb and London, Robb attached a few sample time sheets to demonstrate that three years prior to the filing of plaintiffs' claims, defendants had implemented a "reliable timekeeping system," which he explains had been prompted by a prior lawsuit and which provided a complete defense to plaintiffs' wage and hour claims. (Tr. at 4:7-22). According to Robb, the time sheets had been filled out by plaintiffs themselves. (Id. at 4:23-5:4). He also articulated defendants' position that the plaintiffs were subject to the "janitor" exemption under the NYLL, and there was a substantial likelihood that plaintiffs would recover nothing. (Id. at 3:25-4:6; Robb Decl., Ex. B). Specifically, defendants' counsel explained that under New York Law, the Department of Labor had issued a building service wage order (the "Wage Order") that exempts persons engaged in physical labor and

---

[2]Citations to "8/24/15 Reply Decl." refer to the Reply Declaration of Arthur Robb that was submitted in support of the motion to enforce the settlement, dated August 24, 2015.

[3]Citations to "Tr." refer to the transcript of the hearing held before this Court on December 11, 2015.

[4]Citations to "Robb Decl." refer to the Declaration of Arthur J. Robb that was submitted in support of defendants' motion to enforce the settlement agreement, filed on July 28, 2015.

maintenance of residential buildings from the overtime requirement of New York State law. (Tr. at 3:25-4:6). In response, London indicated that he would review the Wage Order, "talk with my clients," and get damages spreadsheets to defendants. (Id.)

On March 19, 2015, Robb emailed London at 11:45 a.m. stating:

> Scott, assuming you have authority to settle at $17.5k,
> I would consent to adjourn the conference in contem-
> plation of settlement. Let me know what you want to do.

(Robb Decl., Ex. C). In response, London sent an email to Robb and to Constantine Tzifas, stating that "I have the authority to settle the case at $17.5k." (Robb Decl., Ex. C). In that email, London also asked that Robb coordinate with "Gus" to seek an adjournment of the initial conference. (Id.) In a responsive email, plaintiffs' counsel of record, Tzifas, indicated that he was on his way to court but that Robb had his consent to adjourn the conference, signing off on the email as "Gus." (Id.)

Thereafter, defendants' counsel drafted a written settlement agreement and sent it to plaintiffs' counsel. (Tr. at 5:21-25). In an email exchange on May 12, 2015 and May 14, 2015, plaintiffs' counsel confirmed the acceptance by plaintiffs of the agreement. In the May 12, 2015 email to Robb, and copied to Tzifas, London wrote: "After lengthy discussions, the plaintiffs approved the following settlement check [sic] amounts: Marco Bravo - 33% = $3718.20[;] Deifilio Cordero - 7% = $788.70[;] Wilson Vicuna - 41% = $4619.56[;] Blanca Alvarex - 19% = $2140.78." (Robb Decl., Ex. D; see Tr. at 5:25-6:2). The email asked that Robb make these changes to the settlement agreement and send him a copy "that I can finally get signed off." (Id.) Robb responded in an email, copied to counsel of record, Tzifas, that he would try to get to it that night. (Id.) On May 13, 2015, London again inquired about the agreement, and Robb

4

responded on May 14, 2015 by sending the agreement to London. (Id.; see Robb Decl., Ex. E).

London indicated his receipt and stated: "I'll get this signed asap." (Id., Ex. D).

On May 21, 2015, London sent Robb an email indicating that the plaintiffs had reneged

on their agreement to settle. The email, which was again copied to Tzifas, stated in full:

> Arthur,
>
> The signing party turned into a mutiny. The plaintiffs
> reneged on their agreement and informed us they will
> look for a new attorney. Gus Tzifas would like to know
> if you would consent to staying the matter while the
> plaintiffs obtain new counsel.

(Robb Decl., Ex. F). Thereafter, plaintiffs retained new counsel, the firm of Gordon & Gordon,

and defendants moved to enforce the settlement.

Plaintiffs argue that because London had no authority to settle the case on behalf of the

plaintiffs, the settlement should not be enforced. They argue that London was not the attorney

of record in the case, that plaintiffs never manifested their intent to have London negotiate or

settle the case on their behalf, and they never agreed to the terms of the settlement nor did they

sign the settlement agreement. Defendants argue that the Court should enforce the settlement as

reached between the parties, arguing that it is an enforceable contract and that London had

apparent authority to settle the case.

In light of the Second Circuit's decision in Cheeks v. Freeport Pancake House, 796 F.3d

199, 206 (2d Cir. 2015), the Court requested that the parties submit additional briefing

explaining why the proposed settlement agreement was fair and reasonable.

## DISCUSSION

A. Former Counsel's Authority

    1. Legal Standard

        Turning to the question of whether a binding settlement was reached, it is undisputed that "the decision to settle is the client's to make, not the attorney's," Fennel v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989), and the attorney must be authorized by his client to enter into a settlement.  See United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 19-20 (2d Cir. 1993). The authority may be actual or apparent.  Id. at 20.  Whether an attorney possesses actual authority to settle rests on an examination of the dealings between the attorney and the client to determine whether the attorney's actual authority "may be inferred from the words or conduct of a client which the client had reason to know would be regarded by the attorney as authorization to settle."  Delgrosso v. City of New York, No. 11 CV 4876, 2013 WL 5202581, at *5 (E.D.N.Y. Sept. 13, 2013) (quoting Joseph v. Worldwide Flight Servs., Inc., 480 F. Supp. 2d 646, 653 (E.D.N.Y. 2007)) (internal quotation marks and citations omitted).

        As to apparent authority, the Second Circuit has stated that if an "attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld."  Fennel v. TLB Kent Co., 865 F.2d at 502 (citing International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 55 (2d Cir. 1979)); accord Janneh v. GAF Corp., 887 F.2d 432, 436 (2d Cir. 1989).  The attorney may not create apparent authority through his own actions; rather, the actions of the client towards the third party creates apparent authority.  Fennel v. TLB Kent Co., 865 F.2d at 502 (citing Trustees of UIU Health & Welfare Fund v. New York Flame Proofing Co., 828 F.2d 79, 84 (2d Cir. 1987)).

Moreover, because of the strong public policy favoring settlements, an attorney of record who enters into a settlement agreement on behalf of his client is presumed to have the authority to do so, and a party who challenges such an attorney's authority to settle bears the burden of proving with affirmative evidence that the attorney lacked authority. In re Artha Mgmt., Inc., 91 F.3d 326, 329 (2d Cir. 1996).

2. <u>Analysis</u>

a) <u>London is Not the Attorney of Record</u>

Plaintiffs argue that since London was not the attorney of record, he did not have apparent authority to settle the case on their behalf. (Pls.' Opp.[5] at 3). Plaintiffs also contend that they never retained London as their attorney, that London never filed a notice of appearance with this Court, and that it was Tzifas who commenced this action and who was the plaintiffs' attorney of record. (<u>Id.</u> at 4). In support of this argument, plaintiffs provided the Court with copies of the Consent to Change Attorney with Tzifas' signature as well as Tzifas' affidavit in support of the motion for withdrawal by counsel. (Pls.' Opp., Ex. 3).

After reviewing the parties' submissions and considering the testimony at the hearing held before this Court on December 11, 2015, the Court is not persuaded by plaintiffs' argument that solely because London was not the attorney of record, he did not have apparent authority to settle the case. In fact, the Court finds that London did have apparent authority to settle the case on behalf of plaintiffs for the sum of $17,500. First, Robb's submissions of the email exchanges

_____

[5]Citations to "Pls.' Opp." refer to plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Enforce Settlement Agreement, dated August 17, 2015.

between him and London, and Robb's testimony at the hearing made clear that he had no reason to doubt that London had been given authority to settle the case.  Although Tzifas is listed on the docket sheet as the attorney of record for plaintiffs, Robb testified that Tzifas told him to contact London because London was handling the case.  (Tr. at 3:16-21 (stating "[a]t the outset of the litigation I reached out to opposing counsel, Mr. Tzifas . . . . Mr. Tzifas referred me to Mr. London, who was handling the case day to day . . . .")).  In addition, Tzifas testified at the hearing that "we have signed retainers with each one of the plaintiffs" (see Tr. at 17:8-14), suggesting that both he and London had signed retainer agreements with the plaintiffs.[6]

Further, many of the emails between Robb and London were also sent to Tzifas.  For example, on March 19, 2015, Robb sent London the following email: "[London], assuming you have authority to settle at $17.5K, I would consent to adjourn the conference in contemplation of settlement.  Let me know what you want to do."  (Robb Decl., Ex. C).  Twenty minutes later, London responded to Robb, copying Tzifas on the email, stating the following: "[Robb], I have the authority to settle the case at $17.5K.  Please coordinate with [Tzifas] (copied on this email) to adjourn the conference."  (Id.)  Thirty minutes after this email, Tzifas joined the email conversation, thanking London and stating that he consented to a request to adjourn the conference.  (Id.)

These emails support the conclusion that Tzifas, as attorney of record, authorized London to negotiate a possible settlement with Robb.  (Id.)  Morever, Tzifas not only failed to object to the settlement amount upon receiving London's email indicating that he had authority

---

[6]The Court notes that neither plaintiffs nor counsel for plaintiffs have produced the retainer agreements for this Court's review.

8

to settle at $17,500, but Tzfias actually thanked London, thus conveying his approval of the settlement amount. Based on these email conversations alone, Robb had no reason to doubt that it was London, and not Tzifas, who was handling the case, despite Tzifas' technical status as attorney of record. Indeed, when Tzifas tried to adjourn the status conference before this Court and dismiss the case, Robb believed that the case had been resolved. Given that Tzifas was included in all relevant communications between London and Robb in which the specific amount of the settlement was discussed and agreed upon, and Tzifas' representation that London indeed had authority to settle the case for $17,500, the Court is not persuaded by plaintiffs' argument that simply because London was not the attorney of record, he lacked authority to settle the case. It is clear from both the testimony and the above emails that London was acting as agent of Tzifas and had been authorized by Tzifas to handle the matter and secure a settlement with Robb. Tzifas, as counsel of record, then confirmed acceptance of the settlement amount in an email sent to both London and Robb.

### b) Plaintiffs Deny Giving Authority to London

Plaintiffs argue that they never communicated, through words or conduct, either explicitly or implicitly, that London was their attorney or that he had their permission to negotiate and settle the case on their behalf. (Pls.' Opp. at 3). Plaintiffs state that upon learning of the settlement amount, they promptly changed attorneys and expressed their displeasure with the amount. (Id.) The Court notes that although the plaintiffs appeared at the hearing, they did not testify; indeed, they did not even submit sworn written statements as to their rejection of the settlement and their counsel's authority. Instead, their position was set forth only through the

9

arguments of new counsel.

Again, in light of the testimony at the hearing and the emails submitted in support of defendants' motion to enforce the settlement, the Court is not persuaded by plaintiffs' argument that they never gave London authority to negotiate and settle the case on their behalf. On March 19, 2015, Robb offered to settle the case for $17,500, which London accepted. (Robb Decl., Ex. C). Then, on May 12, 2015, London sent an email to Robb stating, "[a]fter lengthy discussions, the plaintiffs approved the following settlement check [sic] amounts: Marco Bravo - 33% = $3,718.20; Deifilio Cordero - 7%= $788.70; Wilson Vicuna - 41%= $4,619.56; Blanca Alvarez - 19%= $2,140.78." (Id., Ex. D). London then asked Robb to make the changes to the settlement agreement and to send a final copy for the plaintiffs to sign. (Id.) Several days later, after receiving the revised settlement agreement, London informed both Robb and Tzifas that the plaintiffs had reneged on their agreement, and that "[t]he signing party turned into a mutiny." (Id., Ex. F). These emails demonstrate that London was in contact with his clients, had "lengthy discussions" with them, and provided Robb with the breakdown of the plaintiffs' agreed-upon settlement figures. The May 21, 2015 email indicating that plaintiffs were replacing both London and Tzifas and getting an entirely new firm to represent them supports the view that they were aware that London and Tzifas were working together.

This conclusion is further corroborated by London's testimony at the hearing, where he indicated that during negotiations, London would contact his clients through an interpreter because "[he] speak[s] Spanish, but not very well, and [his clients] speak English but not very well." (Tr. 18:14-19). London also testified that he had "several phone calls" with the plaintiffs. (Id. at 18:16). With regards to the $17,500 settlement amount and breakdown per

plaintiff, Mr. London testified that he conveyed this amount to the clients and "finally they talked about it, [and] they agreed to the numbers." (Id. at 18:20). London also recalls having a "follow up call where we discussed what they were going to be getting and they didn't like it but they wanted to have some quick resolution." (Id. at 18:20-24). On multiple occasions at the hearing, London stated he thought the parties had agreed on a number. (Id. at 18:25-19:1; 19:12-22).

However, despite London's testimony at the hearing, plaintiffs' new counsel argued at the hearing that plaintiffs "had actually never approved any figures, they had never been told there was a settlement. They had just gotten the phone call saying that this matter is settled, you know, your checks will be ready soon." (Id. at 16:12-18). Plaintiffs' new counsel's version of the events suggests that plaintiffs never spoke to London; they simply received a phone call from the attorney stating that they would get a certain amount of money and that the case had been resolved. It is notable that none of the individual plaintiffs testified at the proceeding; their position, as articulated by new counsel, is not credible in light of London's testimony and the multiple emails and representations made by London to Robb and to the Court, indicating that he spoke with the clients several times, had lengthy discussions with the plaintiffs over the settlement amounts, and received the settlement breakdown for each plaintiff from the plaintiffs themselves.

Plaintiffs' argument that they rejected the settlement in a timely manner also fails, since the above emails between London and Robb suggest that from March until late May, plaintiffs did not object to the settlement amount. Specifically, Robb offered to settle the case for $17,500 in March 2015. Then, on May 12, 2015, London confirmed this amount and provided

11

Robb  with the settlement amount for each plaintiff.  It appears that one week later, on May 20, 2015, plaintiffs conveyed to London that they did not agree with the settlement amount and wanted a new attorney.

From the evidence presented and the testimony of the witnesses, which the Court credits, it seems clear that London had authority to settle the case on behalf of the plaintiffs and they simply changed their minds.

B.  The Enforceability of the Settlement Agreement

Plaintiffs contend that even if London had authority to negotiate a settlement on plaintiffs' behalf, the settlement is not enforceable until the clients have signed off on the agreement.

1.  Legal Standard

"It is well established that parties are bound to the terms of a contract even though it is not signed [or even written]."  North Fork Country, LLC v. Baker Publ'ns, Inc., 436 F. Supp. 2d 441, 444-45 (E.D.N.Y. 2006) (quoting Omega Eng'g, Inc. v. Omega, SA, 414 F. Supp. 2d 138, 148 (D. Conn. 2004), aff'd 432 F.3d 437 (2d Cir. 2005) (brackets in original) (citations omitted)).  In other words, the mere "intention to commit an agreement to writing will not prevent contract formation prior to execution."  Winston v. Mediafare Entm't Cor., 777 F.2d 78, 80 (2d Cir. 1985).  Thus, where a settlement agreement has not been reduced to writing, courts must determine whether the parties intended to be bound by the agreement in the absence of a writing.  Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007).  The court may, in fact, enforce

12

a settlement agreement that has not been fully executed where the parties have made clear their intention to settle and the conditions of the settlement. See Mone v. Park East Sports Med. & Rehab., P.C., No. 99 CV 4990, 2001 WL 1518263, at *2 (S.D.N.Y. Nov. 29, 2001) (citing Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1986)); see also Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322-23 (2d Cir. 1997).

In Winston v. Mediafare Entm't Corp., the Second Circuit adopted a four-factor test to determine whether parties intended to be bound by a settlement agreement absent a document executed by both sides. 777 F.2d at 80. The factors are as follows: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." Id. at 80-81. In evaluating these factors, the court may consider oral testimony, correspondence, and other writings. Id. No single factor is dispositive, but each provides significant guidance. Id.

2. Analysis

First, there is no indication that either party expressly reserved their right not to be orally bound. Although at the hearing, London stated that "we have always worked under the assumption that there was a – the agreement would have only been consummated once there was signed writing" (see Tr. 15:22-24), this is insufficient to establish that London expressed to Robb that the parties would not be bound until the agreement was signed by either party. Second, although defendants have not presented evidence that they paid plaintiffs the amount

13

stated in the settlement agreement or signed the written settlement agreement themselves, defendants prepared the formal settlement papers, revising them several times at London's request (see Tr. at 19:6-8; Robb Decl., Ex. D), and sent them to London for execution. (See id.) Further, defendants also prepared the Rule 41(a) stipulation of dismissal and sent this document to plaintiffs along with the settlement agreement, demonstrating defendants' understanding that a final agreement had been reached and that the parties were prepared to dismiss the case. (See id.)

Upon reviewing the settlement agreement and the emails attached to defendants' motion papers, it appears that the parties had agreed to all the relevant and material terms; there was nothing further that required negotiation. As to the final factor, the Second Circuit has held that "agreements of the sort committed to writing are generally ones that involve complex terms or have long-term effects." Britto v. Salius, 360 F. App'x 196, 199 (2d Cir. 2010) (citing Ciaramella v. Reader's Digest Ass'n, 131 F.3d at 326). In this case, the agreement appears to be quite straightforward; plaintiffs would receive a total amount of $17,500 in resolution of all of their claims against the defendants. The settlement agreement does not reveal any complexities or contingencies that needed to be reduced to writing; it was "a simple exchange of [a release] for termination of the lawsuit, and had no far-reaching effects." Id. Accordingly, the Court finds that counsel for the parties intended to be bound by the agreement they reached on May 14, 2015. (See Robb Decl., Ex. D).

C. <u>Whether the Settlement Agreement is Fair and Reasonable</u>

Despite this Court's finding that plaintiffs' former counsel had authority to enter into a settlement agreement and that the parties did reach an enforceable settlement under <u>Winston</u>, this Court must perform an independent assessment of the fairness of the settlement in light of the Second Circuit's decision in <u>Cheeks v. Freeport Pancake House</u>, 796 F.3d 199, 206 (2d Cir. 2015).

In <u>Cheeks</u>, the Second Circuit held that "Rule 41(a)(1)(A)(ii) stipulated dismissals settling FLSA claims with prejudice require the approval of the district court or the DOL to take effect." <u>Id.</u> In this case, since defendants submitted a draft Rule 41(a) stipulation of dismissal with prejudice along with the revised settlement agreement for plaintiffs to sign, there is no question that the Court is required to assess the fairness and reasonableness of the settlement agreement. (<u>See</u> Robb Decl., Ex. E). Although at the hearing, counsel for defendants noted that <u>Cheeks</u> does not apply to state law claims (<u>see</u> Tr. at 6:22-25), he also conceded that the settlement agreement does not distinguish between plaintiffs' FLSA claims and their NYLL claims. (<u>Id.</u> at 28:7-13). Therefore, the Court will review the entire settlement agreement under the <u>Cheeks</u> standard.

In reaching its decision in <u>Cheeks</u>, the Second Circuit explained that requiring judicial approval of such settlements is consistent with the FLSA's underlying purpose: "to extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." <u>Id.</u> (quoting <u>A.H. Phillips, Inc. v. Walling</u>, 324 U.S. 490, 493 (1945) (internal quotation marks omitted)). Further, the court explained that the FLSA was designed to "remedy the evil of overwork by ensuring workers were adequately compensated for

15

long hours, as well as by applying financial pressure on employers to reduce overtime." Id.

(quoting Chao v. Gotham Registry, Inc., 514 F.3d 280, 285 (2d Cir. 2008) (internal quotation

marks omitted)). Therefore, the court in Cheeks concluded that "[i]n service of the statute's

remedial and humanitarian goals, the Supreme Court consistently has interpreted the Act

liberally and afforded its protections exceptionally broad coverage." Id. In reaching its

decision, the court in Cheeks cited Socias v. Vornado Realty L.P., which observed that "judicial

approval furthers the purposes of the FLSA, because '[w]ithout judicial oversight, . . . employers

may be more inclined to offer, and employees, even when represented by counsel, may be more

inclined to accept, private settlements that ultimately are cheaper to the employer than

compliance with the Act.'" Id. (quoting Socias v. Vornado Realty L.P., 297 F.R.D.38, 40

(E.D.N.Y. 2014)). Furthermore, even when represented by counsel, low wage employees "often

face extenuating economic and social circumstances and lack equal bargaining power," making

them "more susceptible to coercion or more likely to accept unreasonable, discounted settlement

offers quickly." Id. The FLSA aims to solve this problem. See id.

Since Cheeks, courts have considered the following factors when determining whether

the proposed settlement is fair and reasonable: "(1) the plaintiff's range of possible recovery; (2)

the extent to which the settlement will enable the parties to avoid anticipated burdens and

expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation

risks faced by the parties; (4) whether the settlement agreement is the product of arm's length

bargaining between experienced counsel; and (5) the possibility of fraud or collusion." Lazaro-

Garcia v. Sengupta Food Servs., No. 15 CV 4259, 2015 WL 9162701, at *2 (S.D.N.Y. Dec. 15,

2015) (quoting Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012) (internal

16

quotation marks and citations omitted).

Here, defendants assert that the settlement is fair and reasonable under Cheeks for two reasons. First, the "sample" time sheets produced to plaintiffs' former counsel "flatly contradicted the work schedules alleged in the Complaint." (Defs.' 10/23/15 Ltr.[7] at 2). Defendants contend that these time sheets were signed and completed by plaintiffs. (Id.) Second, defendants argue that plaintiffs are considered "janitors" under the NYLL, and thus are exempt from the NYLL minimum wage and overtime requirements. (Id.) In response, plaintiffs argue that plaintiffs were forced to sign the time sheets, which do not accurately reflect the time that they worked. (Tr. at 25:1-7). Plaintiffs also dispute defendants' argument that the four plaintiffs would be considered janitors under the NYLL. (Pls.' Mem.[8] at 3). Specifically, two of the plaintiffs allege that they were hired by defendants as porters, and the other two plaintiffs who were janitors worked at more than one building and do not fall under the janitor exemption. (Id.; Tr. at 25:25-26:3).[9]

As it stands, the defendants have not provided the Court with sufficient information, which would allow the Court to find that the settlement reached is fair and reasonable under Cheeks. The Court is primarily concerned that the parties have not engaged in any formal discovery, and based on the parties' submissions and the testimony at the hearing, have

---

[7]Citations to "Defs.' 10/23/15 Ltr." refer to defendants' letter regarding the fairness of the settlement, dated October 23, 2015.

[8]Citations to "Pls.' Mem." refer to plaintiffs' Brief in Further Support of Plaintiffs' Opposition to Defendants' Motion to Enforce Settlement Agreement, dated January 15, 2016.

[9]In the Complaint, only one plaintiff alleges that she worked as a porter. (See Compl. ¶¶ 8(a), 15(a)). However, at the hearing and in the plaintiffs' briefing to the Court, plaintiffs maintain that two plaintiffs worked as porters. (Pls.' Mem. at 3; Tr. at 25:25-26:3).

17

conducted very little informal discovery prior to settlement. In particular, in any wage and hour case, time records are generally produced to plaintiffs; however, in this case, defendants have provided only a few "sample" time sheets to both plaintiffs' former counsel and current counsel. Thus, plaintiffs have never obtained records for the entirety of their employment with defendants. (See Defs.' 10/23/15 Ltr., Exs. C-E; Pls.' Mem. at 3; Tr. at 26:16-17). Morever, according to the time sheets that plaintiffs were able to obtain, their calculations as to their claims far exceed the settlement amount of $17,500. For instance, under the settlement agreement, plaintiff Bianca Alvarez would receive $2,140.78 (see Robb Decl., Ex. E); however, plaintiffs' new counsel calculates Ms. Alvarez's potential recovery to be $168,330.00, based on the few records that plaintiffs had in their possession. (Pls.' Mem. at 3). This overwhelming disparity between the settlement amount and plaintiffs' alleged possible recovery weighs against finding that the settlement agreement is fair and reasonable under Cheeks. Of course, the Court is not suggesting that plaintiffs would be able to prove that Ms. Alvarez should recover $168,330.00; however, at this point, defendants have not explained how they justify as reasonable a total amount of $17,500 divided among all four plaintiffs, or $2,140.78 for Ms. Alvarez individually. Nor have they provided any factual basis underlying this settlement amount.

With respect to defendants' argument that the plaintiffs are exempt under the NYLL because of their roles as "janitors," defendants again have failed to provide any explanation as to why the exemption applies to all four plaintiffs. Even though plaintiffs acknowledge that

plaintiffs Bravo and Vicuna were janitors,[10] they argue that the exemption still does not apply

because they both worked at more than one building.  (Pls.' Mem. at 3).  As to plaintiffs Alvarez

and Cordero, plaintiffs contend that they were porters and not janitors, and in the Complaint,

plaintiff Alvarez alleges that she was a porter while plaintiff Cordero alleges that he was a

superintendent.[11]  (See Compl. ¶¶ 8(a), 15(a)).  Based on the allegations in the Complaint,

defendants have not provided sufficient facts that would allow the Court to determine if

plaintiffs Bravo and Vicuna, as superintendents, or plaintiffs Alvarez and Cordero, as porters,

fall within the janitorial exemption under the NYLL.  See Koljenovic v. Marx, 999 F. Supp. 2d

at 399 ("Deciding whether the janitorial exemption applies may require the court to consider

both questions of fact and law; the question of how an employee spends his time is factual,

while the issue of whether such activities render the employee exempt from the overtime

provision is a question of law").

　　　Perhaps more important, the janitorial exemption under the NYLL does not apply to

---

[10]In the Complaint, plaintiffs Bravo and Vicuna allege that they worked as
"superintendent[s]" for defendants.  (Compl. ¶¶ 16, 1(a)).  Even though the court in Koljenovic
v. Marx, 999 F. Supp. 2d 396, 399 (S.D.N.Y. 2014), found, on undisputed facts, that building
superintendents were janitors within the statutory exemption, other courts have held that
employers cannot rely on the general assertion that building superintendents are always janitors
under the NYLL exemption.  See, e.g., Gjoni v. Orsid Realty Corp., No. 14 CV 8982, 2015 WL
4557037, at *7 (S.D.N.Y. July 22, 2015), appeal withdrawn (Nov. 16, 2015) (denying
defendants' motion to dismiss because defendants failed to show any facts particularized to
plaintiff that his job as a building superintendent fell within the janitorial exemption).

[11]Again, the Court notes that there is a discrepancy between the allegations in the
Complaint and plaintiffs' argument at the hearing and in their briefs as to Cordero's position
with the defendants.  Plaintiffs now maintain that Cordero was hired as a porter; however, the
Complaint alleges that Cordero worked as a superintendent.  The Court need not resolve this
discrepancy since, based on the allegations in the Complaint, defendants have not provided
sufficient facts that the plaintiffs are subject to the janitor exemption under the NYLL.

plaintiffs' FLSA claims and would not prevent their recovery for periods covered by the FLSA. See Gjoni v. Orsid Realty Corp., 2015 WL 4557037, at *7 (analyzing the janitorial exemption under the NYLL as to plaintiffs' NYLL overtime claims only). While plaintiffs may face a significant litigation risk based on the defenses raised, at this point, defendants have not persuaded the Court that the settlement agreement is fair and reasonable under Cheeks.

Given that defendants have failed to produce the majority of plaintiffs' time records and have not provided any evidence as to whether plaintiffs performed duties that would make them "janitors" under the NYLL, the Court finds that plaintiffs cannot assess their own litigation risks or possible range of recovery. Therefore, this settlement agreement represents the type of settlement that the Second Circuit in Cheeks intended to prevent, where plaintiffs "lack equal bargaining power," and accepted an "unreasonable, discounted settlement" in order to resolve the case quickly. See Cheeks v. Freeport Pancake House, 796 F.3d at 206 (quoting Socias v. Vornado Realty L.P., 297 F.R.D. at 40). Accordingly, the Court respectfully recommends that the settlement agreement be rejected under Cheeks.

CONCLUSION

In summary, the Court finds that London had authority to settle the case on behalf of plaintiffs and that the parties reached a valid settlement agreement under Winston. However, given that the Court has a duty to assess the fairness and reasonableness of the settlement agreement before it can take effect under Cheeks, the Court respectfully recommends that the

20

settlement agreement not be found fair and reasonable.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order.  See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Secretary of Health &

Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
         March 18, 2016

/s/ CHERYL L. POLLAK        3/18/16

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

21